IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2024

IN RE RAIDYN C.[1]

**Appeal from the Circuit Court for Hamilton County**
No. 23A111            L. Marie Williams, Judge

_____

No. E2024-00286-COA-R3-PT

_____

This action involves the termination of a mother's parental rights to her minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish the following statutory grounds of termination: (1) abandonment for failure to provide support and (2) the persistence of conditions which led to removal. The court found that termination was in the child's best interest. We affirm the termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

Tessa Creighton, Chattanooga, Tennessee, for the appellant, Tara C.

Jennifer A. Mitchell, Dunlap, Tennessee, for the appellees, Tracina and Richard B.

**OPINION**

**I.     BACKGROUND**

Raidyn C. ("the Child") was born to Tara ("Mother") and Colton C. ("Father") in February 2016. Father has been incarcerated on and off throughout the Child's life. Mother lived with the Child in the paternal great-grandmother's home. In March 2017, she moved with the Child into a trailer. At that time, Mother had two additional children who lived with them on a bi-weekly basis. Mother was unemployed and reliant upon family

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

members for financial support. As the months progressed, the trailer became unkempt and unsanitary due to Mother's emotional state following the Child's birth.

On March 18, 2018, Mother, while traveling with the Child to visit Father at the correctional facility, stopped at a Dollar Store. Mother purchased some items before reentering the car, locking the doors, rolling the windows slightly down, and unbuckling the Child. Passersby later alerted the authorities because Mother appeared unconscious while the Child was attempting to escape the car through a front window. Mother was arrested and charged with driving under the influence, possession of drug paraphernalia, and child endangerment. She tested positive for Amphetamine, Methamphetamine, Benzodiazepines, and THC. She admitted regular methamphetamine use, specifically on Wednesdays when she exchanged her older children with their father.

The Tennessee Department of Children's Services ("DCS") removed the Child from Mother's care and initially placed him with the maternal grandparents, who determined that they were unable to care for the Child on a permanent basis.[2] The court transferred custody of the Child to Tracina and Richard B., the paternal grandmother and grandfather (collectively "Grandparents"). The court instructed Mother to complete a non-custodial permanency plan before petitioning the court.

The permanency plan, dated April 3, 2018, contained the following requirements: (1) schedule and complete an alcohol and drug assessment and follow recommendations; (2) attend all intensive outpatient treatment classes; (3) will not associate with drug users; (4) submit to random drug screens; (5) resolve legal issues; (6) obtain and maintain employment; and (7) address depression and complete action steps to improve mental stability. Mother participated in the creation of the plan and signed the plan, indicating her assent to the terms. The Child was later adjudicated as dependent and neglected.

Mother did not maintain visitation on a regular basis. In 2020, she moved to Florida, where she met her current paramour, Cody A. They conceived an additional child, a daughter born in August 2021. They moved to Colorado in November 2021 and returned to Tennessee in April 2022, after which Mother began requesting visitation with the Child. Mother filed a petition for custody on December 19, 2022. Grandparents filed a petition for termination of Mother and Father's parental rights and for adoption on January 17, 2023, citing the statutory grounds of abandonment for (1) failure to visit and (2) failure to remit support and (3) the persistence of conditions which led to removal.[3]

_____

[2] The two older children were also removed. Mother has since regained custody of them.

[3] Father consented to the termination of his parental rights contingent upon Grandparents' adoption of the Child. He is not a party to this appeal.

- 2 -

The case proceeded to a hearing on the termination petition, beginning on December 7, 2023. Tracina ("Grandmother") testified that she visited the Child prior to his removal from Mother's care. She stated that the Child lived with Mother and his sisters in a trailer. The trailer was "not in very good shape," with animals in the trailer and maggots in the trash on the porch. She, and other family members, attempted to help Mother keep the trailer clean by washing clothing and other items. She would also spend time with the Child and his siblings in an effort to assist Mother, who served as the sole caretaker while Father was incarcerated. The condition of the home did not improve despite their efforts.

Grandmother testified that she currently lives with the Child and Richard ("Grandfather") in Soddy Daisy, Tennessee in a house on 65 acres of property. When they obtained custody, they agreed to facilitate visitation with Mother every other Sunday. Mother attended visitation sporadically and often appeared upset that the Child was not in her care. Mother last saw the Child in November 2018. Grandmother asserted that Mother did not call or otherwise contact the Child from November 2018 until July 2022, when she sent a letter requesting visitation. Their home telephone number has remained the same. Grandmother denied receipt of any form of financial support since the time of removal.

Grandmother asserted that she attempted to facilitate a relationship between the Child and his siblings and that they regularly attended events together until February 2022, the date of their last visit for the Child's birthday. She explained that it became difficult to arrange visits with their busy schedules as the girls got older and more involved with extracurricular activities. She asserted that she had no intent to sever the sibling relationship in the event of their adoption of the Child.

Grandmother stated that she currently works at the Child's private school. She and Grandfather provide for him, ensure that he receives appropriate medical care, and remit payment for his school tuition. They assist him with his homework, take him on trips, and just generally spend time with him. The Child refers to her as "mom" and has used that term for approximately one year. She stated that he plays piano, helps on the farm with the cows, and runs his own chicken business in which he is responsible for caring for the chickens, selling the eggs, and managing the revenue from the business. In general, she described a healthy relationship between her, Grandfather, and the Child. She expressed their intent to adopt him should he become available for adoption.

Grandfather confirmed Grandmother's description of a healthy relationship between them and the Child and their intent to adopt. He confirmed that Mother never remitted any form of support for the Child since the time of removal. He stated that he is employed and able to provide financially for the Child. He described the Child's chicken business and estimated that the Child has approximately $4,000 in current revenue from the business.

The Child's teacher confirmed that he was doing well in school. She continued,

- 3 -

> He is an excellent student. He's curious. He easily remembers what he's taught and applies it. He reads above grade level. He is doing extensions in math. He's working at above grade level in math. And he's a joy to have and teach.

She stated that the Child arrives on time, is dressed appropriately, and behaves well. She confirmed that Grandmother is a teacher's aide in her classroom and that Grandfather regularly helps with the forest school. Two family friends also testified concerning their observation of a loving and attentive relationship between the Child and Grandparents.

Mother confirmed that she did not remit child support or otherwise provide any items for the Child during the four months prior to the filing of the termination petition. She acknowledged that she did not provide any such support to Grandparents since the time of removal. She explained that Grandparents advised her that she did not need to remit support and that she sent money to Father with instruction to remit payment to Grandparents. She did not submit any proof of such attempt for the court's consideration. She agreed that she remitted child support for her other children. She also remitted monthly payments for a cellular telephone and a vehicle.

Mother testified that she shared custody of her girls with their father when the Child was born. As to her arrest and the Child's removal, Mother claimed that she stopped at the Dollar Store because she felt nauseous. She never lost consciousness and was aware of the Child with her in the vehicle. She explained that she was not using drugs on that day but that her drug test was positive due to her prior drug use. She explained that she was diagnosed with postpartum depression following the Child's birth and that she self-medicated with drugs. She has since received treatment for her depression following the birth of her youngest child. She has regained custody of her daughters, with one returning in December 2022 and the other returning in March 2023.

Mother stated that she and Cody are now engaged and that she filed for divorce from Father, with a hearing scheduled for February 2024. She was employed when she lived in Florida and then Colorado; however, she is currently unemployed while caring for her youngest child at home. She explained that the cost of daycare for her youngest would likely outweigh her earning potential. She is dependent upon Cody for financial support. They share one vehicle and rent a three-bedroom, double-wide mobile home but do not have a written contract with the owner of the property. She and Cody share a room with the new baby while her two girls each have their own room. She explained that her girls would share a room if the Child returned to live with them.

Mother explained that she moved to Florida in 2020 to "fix" the rest of her life even though she had to leave three of her children behind to make the move. She believed that she is ready to regain custody and care for all her children. She acknowledged that the

Child has spent five years without her and is doing well while under Grandparents' care and supervision. She asserted that she could also provide for him in the event of his return.

As to her failure to visit or contact the Child, Mother claimed that she did not know Grandparents' home telephone number. She claimed that she faithfully attended visitation when allowed but that they refused further visitation after she was arrested a second time in late 2018. She explained that she was living in her car and that the police searched her car and found a bottle of Zoloft that did not have a prescription label. She was arrested and spent two weeks in jail. The charges were dismissed. She attempted to contact Grandparents upon her release; however, the number she had for them was disconnected. She was able to spend several hours with the Child in March 2020 and again in March 2021 while he was in Father's care for his visitation. She sent numerous letters to Grandparents requesting visitation from 2019 through 2022 but did not have proof establishing their receipt of the letters. She only possessed photocopies of the letters she sent.

Cody testified that he and Mother have been in a relationship for approximately three and half years. He confirmed that the Child would have a room in their home upon his return. He stated that Mother gave birth to their youngest child in August 2021 and that they moved to Colorado to spend time with his family before their return to Tennessee. He asserted that Mother worked while in Florida and Colorado but that she has stayed home with the baby since they moved back to Tennessee. He professed that she was a "very, very great mother" and is "always worried about her children." She has always talked about "getting back to her children and having a good, stable life for them."

Cody confirmed that he is employed and able to provide for the family. He acknowledged that he has two biological children who live in another state and that he is responsible for providing financial support for them as well. Likewise, Mother remitted child support through Father for the Child on at least two occasions in either 2020 or 2021. Cody stated that he works six days a week and makes $21.50 an hour. His income for the prior month was $4,600. Their monthly expenses include $1,000 for rent, $813 for a car payment, $121 in car insurance, and $300 in child support for his two children, leaving them approximately $2,300 in discretionary income per month. He acknowledged that Mother was currently unemployed and stayed home to care for their youngest child.

Charlene and Terry R., the maternal grandparents, testified that Mother has improved and evidenced her ability to care for her children. They no longer had concerns about her living situation and did not suspect current drug use. Charlene explained that Mother was a "very lost person" in 2018 when she started using drugs. She transferred custody of the Child to Grandparents because she did not want to enable Mother's behavior. Grandparents allowed them to maintain contact with the Child "in the beginning," but their opportunities for visitation have lessened. She last saw the Child in early 2022.

Father testified that he believed adoption was "the best thing" for the Child, who has a great life with Grandparents. He last saw Mother in April 2023, when they smoked marijuana together and spoke about the upcoming termination hearing. Mother denied any current drug use but admitted that she tested positive for THC sometime in late 2022 or early 2023. She explained that the positive result was due to her use of Delta-8 THC.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds of abandonment based upon failure to remit child support and the persistence of conditions which led to removal. The court did not find sufficient evidence to sustain the ground of abandonment by failure to visit. The court found that termination was in the best interest of the Child. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.      Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.      Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) abandonment for failure to support and (2) the persistence of conditions which led to removal.  Mother objects to the court's application of each ground of termination.  We will address each ground in turn.

### 1.    Abandonment

Abandonment can occur when a parent has "failed to support or [ ] failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i)(a).  The statute defines failure to support as a parent's failure "to provide monetary support or the failure to provide more than token payments toward the support of the child" for the pertinent time period.  Tenn. Code Ann. § 36-1-102(1)(D).  By statute, parents are expected to offer more than "token support," which "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).  Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."  Tenn. Code Ann. § 36-1-102(1)(H).

A lack of willfulness can constitute an affirmative defense to the ground of failure to support. Tenn. Code Ann. § 36-1-102(1)(I).  A parent "shall bear the burden of proof that the failure to . . . support was not willful" and must establish the lack of willfulness by a preponderance of evidence. *Id.*  Efforts to "frustrate or impede a parent's visitation do not provide justification for the parent's failure to support a child financially." *In re Audrey S.*, 182 S.W.3d at 864.

Here, Grandparents filed the termination petition on January 17, 2023, so the

relevant four-month period is September 17, 2022, to January 16, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day petition was filed). Mother alleged a lack of willfulness in her answer to the petition, at the hearing, and now on appeal. She admitted that she never remitted child support to Grandparents during the pertinent time period. She confirmed employment while in Florida and while in Colorado but explained that she has served as a stay-at-home mom since their return to Tennessee in April 2022. She is dependent upon Cody's income, who yields approximately $2,300 in discretionary income each month after their expenses and his child support payments. Mother offered no reasonable explanation as to why she had not provided support through their income as a result of their mutual decision for her to forego employment and stay home with their child. Accordingly, we affirm the trial court on this ground of termination.

### 2.    Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in March 2018 were child safety concerns due to Mother's drug use. While Mother denied continuing use of

drugs, Father testified that he and Mother had smoked marijuana together in April 2023 while discussing the upcoming termination hearing. Furthermore, drug testing of Mother returned a positive result for THC. While Mother alleges that this resulted from her use of a legal substance, Delta 8 THC, the trial court made adverse credibility determinations regarding Mother's testimony in general and when addressing this specific point declared her testimony attributing the positive result to use of Delta 8 THC to be "not persuasive." "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012). The record provides no such clear and convincing evidence that the trial court erred in its credibility assessment. Following our review of the record, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date so that the Child can be safely returned in the near future and that the continuation of the parent's relationship greatly diminishes his chances of early integration into a safe, stable, and permanent home. Accordingly, we affirm the trial court on this ground of termination.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Mother's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights

- 10 -

is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)  The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)  Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)  Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)  Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)  Whether the child is fearful of living in the parent's home;

(G)  Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)  Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)  Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)  Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i).  "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).  The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected."  Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).  We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues.  *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Child's emotional needs.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts).  With respect to these factors, the Child has lived with Grandparents for five and half years in a stable environment with little to no involvement from Mother for at least the past five years.  Questions remain as to Mother's mental and emotional fitness as evidenced by her failure to complete a mental health assessment.  Mother left the state for several years and failed to maintain even the most minimal amount of contact with the Child.  Grandparents have indicated their intent to adopt and a desire to maintain the Child's bond with his siblings.

We turn next to the Child's physical environment and well-being.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home).  Mother has failed to establish her ability to provide a suitable home without assistance from others.  She is dependent upon her current partner and will not be able to provide for the Child should her romantic relationship deteriorate.

- 13 -

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not yet established a lasting adjustment of circumstances.

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Mother has not remitted child support to Grandparents or any other consistent form of support since the time of removal even though she admitted providing child support for her other biological children.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Child's best interest.

## V.     CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Tara C.

_____
JOHN W. McCLARTY, JUDGE